[894 NYS2d 352]

Lawrence Giles, Claimant, v State of New York, Defendant.
(Claim No. 110952.)

Court of Claims, December 21, 2009

**APPEARANCES OF COUNSEL**

*Frekhtman & Associates, Dinkes & Schwitzer, P.C.*, and *Frank A. Ross*, for claimant. *Andrew M. Cuomo, Attorney General (Joel L. Marmelstein* of counsel), for defendant.

**OPINION OF THE COURT**

NORMAN I. SIEGEL, J.

This claim by Lawrence Giles seeks to recover damages for injuries sustained by claimant on May 4, 2005 allegedly as a result of defendant's negligence. A bifurcated trial on the liability portion of the claim was held on May 11-12, 2009.

Claimant testified that on May 4, 2005 he was an inmate at Camp Georgetown, a New York State correctional facility, where he had been since September or October 2004. Mr. Giles was working in the laundry storehouse, where he had worked since November 2004. There were three other people who worked in the laundry with him; however, on the morning of the accident, the other three workers had been assigned to other jobs.

Claimant stated that Mr. Henderson was the supervisor of the laundry. The procedure was that inmate Giles would be picked up at his dorm and taken to other dorms where the laundry was collected. Then the laundry would be taken to the laundry facility where it would be unloaded. Thereafter, the lint would be removed from the dryers; the laundry would be put into the

three washers and washed. The laundry would then be put in the dryers and that would complete the job. The three washing machines in the facility were not the same. Machine number three was the oldest machine, and was the machine in which claimant sustained his injury. The three machines were lined up next to each other against a wall, with electrical circuit breakers behind each machine.

The power switch was on the right front of machine number three. Inmate Giles testified that he was instructed, when he started the job, that the procedure was to load the machines, push the power switch in the front of the machines, and detergent and bleach were loaded automatically. When he started working in the laundry, the lid on the top of this machine was down, locked in that position and could not be opened.[1] It was only opened after the machine started giving them trouble.

Mr. Giles said that maintenance worked on the machine, but could not get the machine to work properly. The maintenance people unlocked the lid and when the machine wouldn't start by pushing the front button, the maintenance people showed Mr. Giles, and the two other employees who worked there, how to start the machine from the inside of the top lid, by pushing a button on the inside of the top portion of the washer.

Mr. Giles testified that he started machine number three approximately four times a day; however, Mr. Giles also testified that the number might be more because in order to open up the door of the machine, he had to have the machine running. So he would have to start the machine to open the door and take the laundry out. Mr. Henderson, a supervisor employed by the facility, was at the facility daily, though not for the entire day. According to Giles, Mr. Henderson knew that the button on the front of the machine did not work, and knew that from November 2004 until the date of the accident the manner in which machine number three was started was to push a toggle switch or maneuver the wires inside the top of the machine. From November 2004 to the date of the accident, the top lid on machine number three had never been locked and remained open so that the machine could be started. Prior to the modification in November, which allowed the top lid to be opened, the lid had never been opened.

---

1. Unlike household washing machines, the top lid of these machines contained the electrical "guts" of the washers and was not meant to be accessible by the ordinary user. The controls of the machine were on the front of the machine; the only reason to open the top lid was to gain access to the electrical components for repair purposes, etc.

Previously, in April 2005 Mr. Giles' hand was slightly injured when the top lid fell on his hand as he was trying to start the machine. Mr. Henderson came over at the time and wrote up a report about the injury, but did not write up Mr. Giles for starting the machine inside rather than from the front door, which he couldn't have done because it didn't work. Mr. Giles testified that he discussed the operation of the machine with Mr. Henderson and complained to Mr. Henderson about having to put his hand into the machine and touch the wires. He said he was told by Mr. Henderson to do what was necessary to work the machine and that he would be given a counseling report if he did not operate the machine as it was. Mr. Giles also testified that he was told by other correction officers that if he got warnings for not following direct orders, he would be sent to a more restrictive prison. Mr. Giles testified that he had been given a written warning and several verbal warnings.

On May 4th, the date of the incident in issue, Mr. Henderson picked up claimant in the morning, they picked up the laundry, went to the laundry facility and started to clean out the lint and load the machines. Claimant was the only inmate doing laundry on that day. Mr. Henderson was there, but the other three workers had been sent to the commissary, which was short of help. Mr. Eastwood, a supervisor, came to the laundry area during the morning. According to Mr. Giles, Mr. Eastwood never said anything about the operation of the machine to the claimant. Mr. Eastwood was not present at the time that Mr. Giles suffered the electrical shock. Mr. Giles said that after Eastwood left, he was told by Mr. Henderson to remove the clothes from machine number three and put them in another machine.

Machine three had stopped at the time, and to get the clothes out, Mr. Giles testified he had to start the machine in order to open the door. Giles had to stand on a platform and reach into the top of machine three to start it. He said he could see into the top of the machine, but could not see the lever or wires necessary to actually start the machine. Claimant, who is left-handed, said that he reached into the machine with his left hand, received a strong shock and was knocked unconscious. He said that an investigation was done after the accident and that he gave a statement.

On cross-examination, claimant stated that he did not have a copy of the written warning that he was given prior to the incident and that he does not know the date of the written warning. He said that he did get the warning for "disobeying a

direct order." He also said that he did have a meeting with the guidance counselor about the written warning. Mr. Giles said that he never filed a written grievance about having to use the modified washing machine. He said that the modification was done sometime around November 2004 by someone from the maintenance department, probably a Mr. Price. Maintenance told him how to use the machine, to wit: by putting his hand in and either hitting the toggle switch or hitting the wires. There were three individuals who worked in the laundry room: Mr. Giles, Mr. Shearing and Mr. Woodson. No one else got a shock while working there.

Harold Eastwood testified next. He stated that he worked for the Department of Correctional Services (DOCS), at Camp Georgetown, for 14 years and retired in August 2006. He was the principal account clerk; however, from February 2005 until at least May 5, 2005, he served as both the principal account clerk and the acting institutional steward. The institutional steward is one level below the superintendent. There are both correction officers and civilians working at Camp Georgetown and Mr. Eastwood was responsible for 18 civilian employees. Eastwood was responsible for purchasing at the camp. Lance Henderson, a civilian employee at Camp Georgetown, worked under Mr. Eastwood's supervision.

Mr. Eastwood testified that he was familiar with the laundry and storehouse facilities and was responsible for both. Both he and Mr. Henderson could write up inmates if they did something improper. On the date in issue, Mr. Eastwood testified that at about 9:45 A.M. he arrived at the laundry facility because the institution had been written up for improper labeling of the bleach container. He said he had come to the laundry facility to make sure that the problem had been properly attended to. Mr. Eastwood testified that he did talk to Mr. Giles and asked Mr. Giles why a bottle of bleach was on the machine. Mr. Giles told him that he did not put bleach in every load if the bleach could damage the clothes. Mr. Eastwood told Mr. Giles that he should get rid of the bottle and that the bleach should be added to every wash.

Claimant complained to Mr. Henderson about machine number three while Mr. Eastwood was there. Mr. Eastwood testified that Mr. Henderson went around the back and tried to start the machine by flipping the circuit breakers on and off. When that didn't work, Mr. Giles reached into the machine. Mr. Eastwood told Mr. Giles not to put his hand back into the

machine because he was afraid "he may be fried." Mr. Eastwood told Mr. Henderson to get maintenance down to fix the machine and went back to his office with a work request shortly after 10:00 A.M. When he got back to the office he called Mr. Price in maintenance and told him to go fix the machine. While he was still there, and before Mr. Price left, he got a call that there was an incident in the laundry room. Both Mr. Eastwood and Mr. Price went to the laundry room. Mr. Eastwood prepared a misbehavior report because Giles disregarded instructions not to put his hand inside the machine. The misbehavior charge was eventually dropped by DOCS. Eastwood testified that Mr. Henderson could have put the circuit breaker in such a position that the washing machine would have no power, but Henderson had not done so.

On cross-examination Mr. Eastwood testified that he told Mr. Giles not to put his hand in the machine because he could be "fried," but did not give him a direct order not to put his hand in. Mr. Eastwood does not recall any event in April concerning Mr. Giles' hand and did not know that the three inmates had all been putting their hands in washing machine number three to start up the machine since November 2004. On May 4, 2005 Eastwood did not order Mr. Henderson to shut down the machine, although on cross-examination he said "I should have." He said he could have ordered the circuit breaker to be shut down, but didn't. Eastwood also acknowledged that he heard Mr. Henderson tell the claimant to take the laundry out of machine number three. He agreed that in hindsight machine number three should have been immediately shut down. He also admitted that if Mr. Giles had not removed the laundry from machine number three, he would have been written up by Mr. Henderson for a misbehavior report for disobeying a direct order.

Lastly, the court reviewed selected portions of the deposition transcript of Lance S. Henderson, submitted as part of the trial record by claimant's counsel. Mr. Henderson is employed at Camp Georgetown Correctional Facility and at the time of the incident was employed there as a "Storage Clerk 2." As aforementioned, among other duties, he was responsible for the laundry and had a work crew of inmates. Unless he was on some sort of leave, Henderson was the only staff person assigned to the laundry storehouse. He explained that the washing machine in issue, which was similar to the other washers, was a heavy-duty commercial-type machine. It was a front

loader and had a power button, which started the machine, on the front of the washer. Henderson testified that Mr. Carroll and Mr. Price, of the maintenance department, handled problems with the washing machines. Three inmates, including claimant Giles, generally worked in the laundry room, and they had worked there at least from November 2004 to May 2005, when the incident occurred.

Mr. Henderson said that he did not attempt repairs of the machines; if there was a problem, he called the maintenance department—Price or Carroll. In response to questioning, Henderson stated that the inmates were not provided with any type of training by Mr. Carroll or Mr. Price with respect to repair of a washing machine. Henderson explained that while the machine was a front-loader, there was a lid on the top of the machine which is opened with a key. The key was kept by the maintenance department to open up the top lid in case of a problem. The top was only accessible by the maintenance department.

Henderson said that prior to the May 4, 2005 incident, there had been problems with the washing machine in issue. The problems started as of November 4, 2004 and cropped up on occasion from then on. The machine had a tendency to stop in mid-cycle, and sometimes the power to the machine would suddenly cut off. Henderson said he would notify maintenance of a problem. The in-house maintenance would attempt the repairs. Mr. Henderson was asked if

> "[a]t any time prior to May 4th of 2005 did you ever see Mr. Giles or any other inmate operator [of the washing machine] attempt to operate the machine by touching or utilizing a button that was located below the lid at the top of the machine and not on the face [front] of the machine itself."

Henderson responded that "I have, but I don't know what switch it was." Mr. Henderson said that the switch inside the top lid was something that would not normally be accessible to someone operating the machine. When asked how claimant Giles or other inmates got access to the inside switch, Henderson responded that "[s]upposedly they were trained by maintenance to do it, to open it up just a little bit to just go in and reach in there."

Henderson said that he had seen claimant Giles operate the machine from the inside of the top lid sometime back in November and that he understood that maintenance had trained

the inmates and that it was "okay." On the date of the incident in May, Henderson believed that maintenance had left the lid unlocked and open, but he did not inquire as to why it was open. He said that underneath the lid are "wires, bolts, hoses for the water, the soap and the bleach to the machine in the back part." When the lid was left open, the wires were accessible to anyone. He did not request that the lid be closed, but he did feel that this was a safety hazard, stating "you don't know what could happen with the lid open."

Henderson stated that with the machine not working properly, he had been advised by the inmates that in order to start the machine, the operator had to put his hand in the top of the machine and push on a lever to start it. He was told by the inmates that this was how they had been starting the machine. He said that the inmates indicated that maintenance had instructed them to do this. Henderson did not contact maintenance at all regarding these alleged instructions to the inmates. Nevertheless, he felt it was dangerous to operate the machine from the top, rather than the front, as designed.

Mr. Henderson testified that in the chain of command, his immediate supervisor was the institute steward. He said that the problems with the machine and the hazard it presented would be the sort of thing he would report to the institute steward, but that he didn't do so for this situation because he assumed that maintenance had reported it. According to Henderson, he had asked maintenance when they were going to rescrew the top lid on, but they didn't give him an answer. He said that he'd asked because he felt it was a safety hazard. Henderson stated that he never instructed the inmates not to use this machine until such time as a repair was made or the lid was resecured.

After the initial problem with this machine developed in November 2004, and the use of the interior button (under the top lid) started, he never called maintenance again or contacted his superiors or anyone else concerning this ongoing condition. Henderson never attempted to resecure the lid to the machine. Yet Henderson testified that he himself would not put his hand in the machine, even though the inmates were doing so, because he thought it was an unsafe thing to do. From time to time, throughout the period of November 2004 through May 2005, he would see an inmate operate the machine by using the interior power switch located underneath the lid. He said that the lid had been up continuously from the time he first noticed it or was alerted to it in November 2004 through the date of the accident in May 2005.

He stated that in order to open the door of the machine (the door where laundry was loaded and unloaded) it was necessary to physically turn on the power switch underneath the top lid. Henderson testified that on the date of the accident it was Mr. Eastwood who gave the order for the laundry to be removed from the machine, though Henderson knew that the only way to do so was to activate the switch underneath the top lid.[2] Eastwood had left the area before claimant activated the switch in order to remove the laundry. Henderson was present and observed Giles at the machine, but never ordered him not to remove the laundry, even though it required using the switch. Henderson was there when Giles was shocked. He saw him put his hand in the top of the machine and in fact, was standing only about one foot away when the incident occurred.

Henderson described the claimant as a cooperative inmate—he said Giles gave him some problems, but no worse than anybody else. He had the authority to write up an inmate for bad behavior and in fact had written Giles up with two or three counseling notes for wrong behavior in the past.

In sum, the credible testimony makes clear that the defendant knew that the machine had not been operating properly since November 2004, months before the claimant was shocked. Furthermore, the defendant's employee in charge of the laundry operation testified repeatedly at his deposition that he considered the operation of the machine via a switch in the top of the machine to be hazardous, yet he took no action whatsoever to inquire as to the nature of the problem, the delay in repairing the starter's problem, or to report the situation to his immediate superior, or to anyone in higher authority. And, when Eastwood allegedly ordered Giles to stop putting his hand in the top of the machine, Giles at the same time, was also ordered, by either Eastwood or Henderson (depending on whose testimony one believes), to remove the laundry from the machine. Henderson was well aware that the machine had to be started in order to open the door to remove the laundry, and yet did not order Giles not to do so.

---

2. Contrast this with the Eastwood testimony. Either way—whether one believes Henderson or one believes Eastwood—claimant had a direct order from Giles' supervisor or his superior to remove the clothes, which both claimant and his immediate supervisor, Henderson, acknowledge required reaching into the top of the machine.

■ Claimant Giles was caught between Scylla and Charybdis. On the one hand, he was ordered not to reach into the top of the machine, and on the other hand, he was ordered to remove the laundry, which required reaching into the top of the machine. The court concludes, based upon the credible evidence, that inmate Giles was obeying the orders of one of defendant's supervisory employees when he was caused to be shocked by operating a machine contrary to its intended operation. Defense counsel makes much of the lack of expert testimony. But under the circumstances of this case, the court does not think such testimony is required. Claimant was required to start the machine, not by pressing the power button on the front of the machine, but by sticking his hand into the internal wiring of the machine, in an area that had to be unbolted and unlocked in order to gain access. Both of defendant's supervisory employees found the situation to constitute an unwarranted hazard. Eastwood, according to his own testimony, was concerned that claimant could be "fried" doing so, and Henderson repeatedly called the arrangement hazardous and refused to put his own hand in the top opening. Contrary to the argument of defense counsel, the court does not find that it takes expert testimony to assess whether this situation was dangerous. Common sense and the testimony of defendant's own employees makes clear the danger presented. And just as clearly, the defendant had been on notice of the dangerous condition for months and had done nothing to remedy the situation.

■ The court finds that the defendant was negligent and the defendant's negligence was a proximate cause of injury to the claimant. As for the alleged negligence of claimant, the court is most sympathetic to the impossible position faced by the claimant. If he put his hand in the machine, he faced possible injury, but if he did not do so, he would be disobeying an order. He had been subjected to prior discipline at the laundry and was aware that he could be disciplined again for the failure to obey an order. Nevertheless, the law is well established that "where an inmate fails to use ordinary care and pursues a dangerous course of conduct, he or she is required to take some responsibility for his or her own negligence" (*Martinez v State of New York*, 225 AD2d 877, 878 [1996], citing with favor *Carter v State of New York*, 194 AD2d 967, 968 [1993]; *see also Hicks v State of New York*, 124 AD2d 949, 950 [1986]; *Telfair v State of New York*, 87 AD2d 610 [1982]).

■ Accordingly, while the court finds the claimant to have been in an untenable position, nevertheless, he does bear some

responsibility for his injuries. The court finds the defendant 85% liable and the claimant 15% liable. All motions not previously decided are denied.